You will hear argument next in Case No. 15-339, Ross v. Blake. Ms. Bernhardt. Thank you, Your Honor. Mr. Chief Justice, and may it please the Court. In this case, the Fourth Circuit adopted a nontextual exception to the requirement of the Prison Litigation Reform Act that a prisoner exhaust available administrative remedies. That exception, if accepted, would eviscerate Congress's intent in adopting the Prison Litigation Reform Act and requiring exhaustion of administrative remedies. In the Fourth Circuit States, where this exception now applies, district courts are now charged with examining prison procedures to see how murky they are. They are dispensing with the requirement of exhaustion at all if there's been an internal investigation. Ms. Bernhardt, can I just ask you to talk about the procedures? Could you explain to me what they are? Certainly, Your Honor. I'd like to begin with the Inmate Grievance Commission, or I'm sorry, Office, formerly the commission, which is the primary administrative remedy for an inmate with a use of force or other condition of confinement. Could I start you off in the reverse order? Because the AARP seems to be the low-level one, and in the initial understandings of this case, everybody was being told the AARP is where you file, and you file there irrespective of whether there's an IIU investigation. Do you continue to take that view, or do you think that that is no longer true? Well, Your Honor, the view has been consistent throughout, and that is that the Inmate Grievance Office is the primary remedy. The Inmate Grievance Office can itself require. I really did ask you to start with the AARP. I'm trying to, yes, Your Honor. Are you supposed to file with the AARP even when there's an IIU investigation? Yes, Your Honor. Yes, you are. Well, why do all of these cases suggest that when that happens, the AARP throws out the case on the view that there's an IIU investigation? When this case arose in 2007, the warden was not required to dismiss it. And so in some of the cases that are before the Court, that is indeed what occurred. There's cases with three wardens where a collection of cases where there was a dismissal. But Do you have any example anywhere of the AARP responding and actually investigating and looking at the issue and making a recommendation or a ruling? The we don't have the paperwork. The cases in Petitioner's Lodging are all cases involving an IIU investigation where it proceeded through the AARP process. In other words, there was a complaint from the warden. In your reply brief, I looked for one APR case where the prisoner filed and the APR itself made a determination. Is there anything in the record? There's nothing in the record like that, Your Honor. And if I might explain that this was not an issue in the district court, and so there was no evidence presented on either side on that point. Well, you've lodged now quite a number of materials, and we can talk about the materials that you've lodged. But now, you know, both parties have lodged materials, and nobody has come up with a case in which the AARP has adjudicated a complaint when there was an IIU investigation going on. Is that right? That's true, Your Honor, and there's a 4-year retention policy for those records. And this case arose in 2007, and so this issue was not brought up until the Respondent's testimony in this Court. But at least it would show that there are papers saying as clearly as it could possibly say, you have filed an AARP, there is an IIU investigation, AARP dismissed. It couldn't be clearer. So you say, well, other cases went the other way. Well, then it sounds like the State is making inconsistent rulings. Nobody knows what the law of Maryland really is. So those letters say unmistakably, your complaint is dismissed because there is an IIU investigation. They can't just erase that. That's what they say. Yes, Your Honor. And the forms also say right on the front that your appeal rights are on the back. And the directives and the handbook all advise the inmates that that's only the first stage of the process. And in Maryland, proper exhaustion is always an appeal to the commissioner and then to file a complaint with the Inmate Grievance Office, which holds a quasi-adjudicatory hearing in every one of these cases. And all one need do is look at the decisions in Petitioner's Lodging. You'll see these were all IIU investigation cases, and all of these inmates had a full adjudicatory hearing on the merits, and some of them got substantial amounts of money. So there is an available remedy in Maryland for prisoners who are assaulted by guards and where there is an internal investigation. And that remedy is the same. I mean, for the prisoner. There is an IAU investigation. The prisoner then files an ARP. Under Maryland's regime, what is to happen to that ARP complaint? At the time of this case and today, the Warden had discretion to reach the merits of it or to administratively dismiss it. Both of those are appealable orders. Kagan. 3 different places, you appeared the office appears actually to have a rubber stamp. I mean, it's the same stamp on all these things, and it says, Dismissed for procedural reasons, this issue is being investigated by IIU. Since this case shall be investigated by IIU, no further action shall be taken under the ARP. That's on a rubber stamp. Yes, Your Honor. And the procedure there is the same in any other use-of-force case, and that is, that is the first-level decision, that is appealable to the commissioner, and then once those two stages within the prison are exhausted, the internal remedy has been exhausted, and the case can be submitted to the Inmates Grievance Commission, which, as the Court of Appeals of Maryland has stated, is the primary administrative remedy. Kagan, we took this case on the view, which was the view that the office represented to us at the time, that the ARP was the proper place to go to receive a remedy, not the proper place to go to receive a rubber stamp saying you've come to the wrong place, but the proper place to go to receive a remedy even when there was an IIU investigation going on. And that is true, Your Honor. Notwithstanding this rubber stamp that's on the crossroad. Yes, Your Honor, because the remedy will be received from the Inmate Grievance Commission. The first stage. Sotomayor, could you please tell me why you can't? What's the purpose of this process? You have regulations, an administrative handbook that says take all of these things to the ARP, take to the IGO directly only these things. Why don't you just say take prison brutality cases to the IGO? If you're not intending to confuse prisoners, if you're not intending to make this process totally opaque, why do you do it that way? Because there's one process for all use of force complaints, Your Honor. And it would be confusing to inmates if you told inmates, well, if you've requested an IOU investigation, then you should use a different process. And it's the one that every use of force, the inmate files the ARP with the warden, the appeals to the commissioner, and then they go to the Inmate Grievance Office. That's right in the handbook at pages 79 to 80. It's the same in the case. Sotomayor, it's more confusing to say, if you filed a IIU, go to IGO. If you go to ARP, if you haven't, if you have, that's more confusing than this process where they go to ARP and they can't get anything. They do, because they proceed up the process. They properly exhaust. All of the examples that they've produced in the Respondent's Lodging, they have four inmates who did not properly exhaust and one who did. Mr. Gladwell. Roberts, I'm sorry. Please finish. He had properly exhausted. He had a hearing at the Inmate Grievance Office. We're talking about what's in the lodgings and what they stand for. These are not in the record before the Court, are they? No, Your Honor. Neither yours nor the other side, right? That's true, Your Honor. Well, I take seriously the requirement that we limit appellate review to the argument that's before the Court. I mean, factual issues like this are something they could deal with in the district court and flesh those out before the court of appeals. And now, as far as I understand, we're the first court that's looked at all these record material, I mean, extra record materials, right? Yes, Your Honor. And we would. So how do we deal with that? I mean, again, both of you are guilty of what I think is a serious, a serious question. What's your proposal for dealing with the fact that so far as we've seen so far, the cases may be the case might well turn on these lodgings if people are going to look at them? Well, Your Honor, we would welcome a remand from this Court to decide the issue in front of it. This issue is very important to the States and to the Fourth Circuit States especially. And we would gladly shoulder the burden on remand to sort these availability issues out. We have much more. Well, it seems to me we should dismiss your writ as improvidently granted. You just we just simply didn't have these materials in front of us and it completely changes the nature of the case. Well, Your Honor, the district court rightly found that the remedy is primary. There was no, the Respondent, he never tried to use any of these procedures. He disclaimed any intention to do so. Well, I suppose dismissing it would be based on a judgment about what these extra record materials show. And if they don't show what your adversary suggests, I don't know why that would be an appropriate course to take with respect to your position. On the other hand, if they do, maybe it would be. I don't, again, it's I think surprising and I'm not criticizing just you. I'm criticizing both of you that we have these materials now. I mean, was the individual represented by counsel below? Yes, Your Honor, and these materials that were submitted present a very misleading picture of the remedies available to inmates, and we felt obligated to respond and demonstrate. Breyer, I understand that, but as I look through it, the reason that it wasn't presented below, I would guess, is given the briefs that I've read, which are very good briefs, people have gone through an enormous amount of work, and that enormous amount of work has produced all this information that wasn't there before. But I would like to know what you'd do if you were me, that is to say, we took this case because we thought that it raises a question of whether the circuit can create an exception to the exhaustion requirement that, to my knowledge so far, is not a traditional exception. And that's why I thought we took it. Now, we discover, having taken it, this new issue that wasn't there. We thought the question was, can you create an exception to the requirement that they have to take account of available administrative remedies? The issue now is whether there was an administrative remedy available on the basis of what I read. It's so complicated that I don't know how a genius would know how that he's supposed to go to the, to the, whatever that AR thing is, you know, while an IIU investigation is going on. You certainly could not be illiterate. I mean, you'd have to do so many initials in this that, that, that, okay. So we could either go into this other issue, or we could send it back to prolong this, or we simply could grant, dismiss it as improvidently granted. So maybe it's an unfair question to ask you. But if you were me, what would you do? The side of the question presented, Your Honor, and that is because it's squarely presented by this record. The procedures in the, the procedures were taken to be clear in the court below. The attorney general. It's pretty hypothetical. If we are to answer the question, is there a special kind of exception to the rule that you have to take into a, that you have to follow available administrative procedures if this is a case where there was no such remedy available? Well, Your Honor, we've produced 13 inmates who used it, so it is available. Inmates have used it successfully, and they've gotten large amounts of money in the district. But it's available to some, and it's not available to others. It's available to all, Your Honor. And if, if inmates are used, many more inmates, you know, that we've proposed have used it successfully than the few that they have who started the process and then abandoned it. Ginsburg. Let's talk about the current regulation. There's a question whether that was always the practice in Maryland. But the current regulation does say, does it not, if an IIU investigation is launched, then you don't use the ARP procedure. Isn't that what the current regulation says? That's not a regulation, Your Honor. That's a directive. That's one of the ARP directives. It does say that it should be administratively dismissed and that that is an appealable decision on the merits that goes to the Inmate Grievance Office. And if I might go back to what was happening in the district court where this case began, is that we had a procedure that was available on its face, and there was never any challenge to availability. The argument was that, well, I went to the internal affairs, and that serves the same purpose. I don't have to exhaust. And that doesn't serve the same purpose. All one needs to do is compare the criminal investigation report at JA 185 with the administrative law decisions that resolve the civil claims. An IIU investigation doesn't produce an administrative decision on a civil claim. It doesn't give an opportunity to settle a civil claim. It serves a completely different purpose. And yet, in the Fourth Circuit States, a criminal investigation is now an administrative civil remedy, and that has been having a very bad effect on Maryland and the Fourth Circuit States. And one need only look at the experience in the Second Circuit to see the effect that's been there. It's totally contrary to the purpose of the prison litigation. Sotomayor, I have to say that when I read the Fourth Circuit decision, there are lines in the Fourth Circuit decision that seem to be deciding this on the burden of proof. They're saying, "... Ross, meaning you, have offered no evidence that would contradict Blake's belief that the IIU's investigation removed his complaint from the typical ARP process." And the Fourth Circuit, that's at 787 F. 3rd. 700. It goes on to say, moreover, that "... the handbook regulations and directives do not contradict Blake's belief that he had exhausted his administrative remedies by removing the incident to senior corrections officers, thereby initiating an IIU investigation." That's at the same page. So I'm not sure what the Fourth Circuit was doing with availability. And so if I'm not sure, what do I do with respect to Justice Breyer's question and Justice Kennedy's question, which is, is this a availability determination? The Fourth Circuit assumed it was available. If you look at Petition Appendix 8, the district court found it was available. The Fourth Circuit assumed that. So it would certainly be appropriate, it seems to me, to remand it to the Fourth Circuit so the Fourth Circuit could sort out any availability issues that have been newly raised, but that the question presented should be decided because of the effect that it has on the administration of the Prison Litigation Reform Act in the Fourth Circuit States. It's a profound impact. It's a special circumstance. Sotomayor's a new regulation that has come in, correct, after this case? And it makes official that the ARRP process will not handle an IIU proceeding? It's not a regulation, Your Honor. It's a prison directive. Prison directive. It's just the first two stages of the process, but not the third stage, not the inmate grieving office stage. That stage is fully open and available to inmates who have IIU investigations. But the IMGO, whatever it is, that is described in this hierarchy as an appellate remedy. No, Your Honor. It's a contested case hearing under the States Administrative Procedure Act. It doesn't review the Court's decision. But the set-up is there are these levels that you go to, and first you go to the ARP, then you go to the commission, then you go to the IGO. So it's usually, it comes in at the third instance. But it's not an appeal, Your Honor. It's a de novo contested case, a quality judicial hearing. But where in this handbook or whatever it is, the grievance procedures, does it tell an inmate, you can go or you must go in the first instance to the IGO when there is an IIU investigation underway? Where does it say? It does not say that, Your Honor. The inmate has a – the inmate can always go to the IGO first if the inmate has a grievance. If the inmate grievance office determines that it should be exhausted, it just gives it to the IGO first. Where does it say you can go to the IGO first? That's in the handbook at pages 79 to 80 is the description. It's a Petition Appendix 79 to 80 is the description of the – of how to file at the inmate grievance office. And there are additional materials available to inmates that aren't in the record because this issue was not brought up in the district court. The directives, a set of directives especially geared to inmates that are not in the record because this issue did not come up in the district court. There is additional information available to show that this is an available mermaid, again, not in the record because this issue was not brought up by Mr. Blake in the district court. So we would strongly urge the Court that if it has issues about availability that it would be most appropriate to remand it and let this be sorted out on remand, because obviously, you know, not having known that this issue was going to come up, we didn't present the evidence. The burden is on the – Mr. Blake to show he meets an exception. He did not meet that burden in the district court. Thank you, Your Honor. Roberts. Thank you, counsel. Mr. Tripp. Mr. Chief Justice, and may it please the Court, we're asking the Court to do two things here today. We think they're both straightforward, and then you can vacate and remand to address these more case-specific arguments that have come up in the briefing. So first, we're asking you to answer the question presented. The PLRA means what it says. It does not have any unwritten exceptions. Blake doesn't even dispute the point. Second, we're asking this Court to reject the part of Blake's argument in part two of his brief, which we think is fairly encompassed within the QP, that a prison's procedure has become unavailable and that a prisoner can jump to Federal court as soon as he could reasonably but mistakenly think that he was done with the grievance process. A reasonable mistake standard is just another way of saying that you only need to exhaust plain procedures. That used to be the rule. Congress deliberately eliminated it when it enacted the PLRA. The rule now is that you need to exhaust all available remedies, and that's critical to making the prisons, not the Federal courts, the primary place for resolving disputes about prison life. Sotomayor, you say in your brief that if regulations are so confusing, now we're arguing about whether to every inmate or every reasonable inmate or to a reasonable inmate. I don't actually see that you would say every reasonable inmate. That's a little – that's not a standard I understand in any context. So we definitely agree, as we say in our brief, that rules could be so confusing that they're no longer available. As this Court said in Booth, available just has its ordinary dictionary meaning of capable of being used for a purpose, and so we think if they're so confusing that they can't be used, if no reasonable prisoner can use them, then yes. Sotomayor, you keep saying no reason, that a reasonable, I would say, consistent with how we always talk about this, no reasonable – a reasonable prisoner would not understand them. Well, I think there's a big difference between a reasonable mistake standard, which is what the court of appeals held. It held that he made a reasonable mistake, and Blake is trying to repackage that as a gloss unavailability. I understand that that's different. Right. And so – and that's the thing that we have trouble with, and so there are two big differences between a reasonable mistake standard and an availability standard, which is the correct statutory standard. The first is just the degree of uncertainty. If you have a body of regulations, it doesn't take that much to say that reasonable minds could disagree about some aspect of the procedure. It is quite another thing to say that they are so confusing that they can't even be used. Breyer. What words should we use? I mean, the statute uses the word exhausted, the word exhausted in administrative law where it's most frequently found, has a huge meaning with exceptions built up over the years. One such exception is for a procedural rule that is, quote, it comes from habeas corpus law, not firmly established and regularly followed, end quote. Now, is that the way to put the exception, to decide that? One, does the word exhausted pick up its administrative law meaning? That's a big question. I'm not sure. Two, if it does, is there such an exception that I just said in administrative law? And three, how do you put it? All right. You say what you wanted to say, because you want to say something. So I think the point you're getting at about not regularly followed is that's better handled in a situation. So Woodford, in this Court's case law, says that when somebody has exhausted it, but has made some kind of a procedural misstep, and the question is whether they should suffer a procedural default, that the question there is, as this Court said in Woodford, whether it's a critical procedural requirement, and we think that the natural analog is what you're talking about from habeas corpus law, that you would be asking whether it's an adequate and independent state ground, similar to that. The inquiry here is different. The inquiry here is just he's saying that it's just so confusing that it's not available. And so we think that the correct standard is the one that's said in Booth, not capable of use for a purpose, the way we articulate it in our brief, we think, is correct if you want to give some guidance. It's that no reasonable prisoner can use it, but you don't need to get that far down in the weeds to reject his argument that a reasonable mistake is enough. So as I was saying, there's two big differences between a reasonable mistake standard and ours. The first, I was saying, is just the degree of ambiguity. The second is that it's myopic. It overlooks all the things a prison system can do to make a system capable of being used, even when it's a little confusing. So if I could just give an example of how this works in the Federal system. So in a Federal system, when somebody arrives in the prison, they're given an orientation, they're given a handbook. If they have questions, there's somebody in each prison who's available to answer questions, provide assistance. And then if he just files something and he makes some kind of procedural mistake, they can do one of two things. The prison can either just accept it and overlook the mistake, or what it can do is take a reasonable time to correct it. And those are all things that a prison can do to make its system just perfectly capable of being used, even if there might be some reasonable ambiguity somewhere in the record. And the reason I'm asking this is because it seems to me that there are three kinds of unavailability, and I'm wondering if you agree with each of the three. One is where the prison says, you can get your remedy over here, and then it turns out that you can't get your remedy over here. So if the prison here said you can get your remedy at the ARP, but you couldn't get your remedy at the ARP, that's a kind of factual unavailability. Do you agree with that? Gannon, Yes, I think so, yes. Kagan in the hypothetical sense, not saying anything about this case? Now, the second is what you were saying. It's like if it's just so confusing that a reasonable person can't use it, and that's your standard, right? Gannon, Right. Kagan And the third is some of these cases arise in the context where the State is deliberately trying to interfere with or trick the inmate or something like that. And you would count that as unavailable, too. Gannon, Yes, and like a sort of threat hypothetical, that kind of thing. Kagan A threat or just deception or something like that. Gannon, Yes. We think that's, as we said in our brief, we think that's fairly usually dealt with under availability. You could have a case where maybe a stopple principle has come in, but in, I think, all or virtually all cases, availability is the appropriate focus and it's going to take over. That's the way this has been working in the lower courts. I mean, because availability is the statutory exception, there is a mountain of lower court case law on this. And so I think the proper way for this Court to delve into these issues is in some case where it's properly presented on cert. The question here, it is squarely presented. The district court here held squarely that he could have filed a grievance. The court of appeals appeared to assume that that was right and just said that it didn't matter because there was an unwritten exception to the PLRA. We're asking this Court to reverse that in his effort to repackage it. Ginsburg Are you taking, or I assume that you're taking no position on whether a remedy is available to this, to Blake? The sort of the Maryland-specific question, yeah. We just frankly don't have an interest in the outcome of that question and don't think this Court would have ever granted cert on it. And we think that that's proper. So the proper approach here is, as we're saying, to answer the question presented, the portion of Blake's argument that we think is fairly encompassed within it, and then to the court of appeals to figure out what to do with all the late-breaking evidence. If there are no further questions. Thank you, counsel. Mr. Hughes. Hughes Thank you, Mr. Chief Justice, and may it please the Court. We submit that the proper outcome of the case would be to dismiss it as improvidently granted or alternatively to affirm. If the Court were to consider affirming this context, we think the first place for the Court to begin is what the term available means in the statutory context. We submit that available. Alito Well, before you get to that, the Fourth Circuit seemed to assume that there was a procedure that was available, and it held that this was excused here even though it was available. Now, do you defend that argument? Hughes Your Honor, I would disagree. I don't think the court of appeals thought that there was something that was available, and it certainly did not think the State had met its burden of showing so. As was pointed out earlier, at Petition Appendix page 13, the court of appeals said Ross has proffered no evidence that would contradict Blake's belief that the process, and that the next page, Petition Appendix 14 to 15, the court of appeals added Ross has provided no practical examples of an inmate being allowed to file an ARP or IGO grievance during or after an IIU investigation. Alito What was the legal rule that the Fourth Circuit adopted? Hughes Well, Your Honor, the Fourth Circuit did adopt a legal rule as has been discussed as that there could be implicit exceptions to the exhaustion requirement. Alito Yes, and that was my question. Is that correct? Do you defend that? Hughes We think that's a correct statement, yes, Your Honor. We do think that that is a correct understanding of implicit exceptions that exist to exhaustion requirements. That said, we think the starting place here should be the meaning of the plain term available that exists in the statute. And if we're correct about what the term available means, I don't think the Court necessarily needs to even reach the rule that was adopted by the court of appeals. We think it was the correct. Kagan But can we think that the Fourth Circuit was wrong with respect to that? I mean, it's a problem leaving it on the books, isn't it?  Well, Your Honor, I think the Court could, though, still, even if it thinks that the court of appeals was wrong about that, still recognize that the additional argument, what the term available means in this context, that we're correct about, and that for multiple reasons, the system that Maryland has in place doesn't meet any conceivable understanding of what available would be. So I think the Court could certainly do that. We would disagree with the submission that the court of appeals was wrong, but we certainly think the starting place here is what available means, and that as applied to this case, and given what we now know as how Maryland has explained it, structured its system, it's certainly not one that would qualify as available. Roberts I'm just going to say what we now know. Do you have any help for me with my concern that none of this is in the record in this case, none of it was before the court of appeals, none of it was before the district court, what should I do about that? Yes, Your Honor, I have two principal responses to that. First is the material I just read from the court of appeals made quite clear. The court of appeals recognized that the State had failed to identify any examples where any remedy in these circumstances was available. Our principal argument throughout the district court and the court of appeals mind you, after we got past the waiver argument, our first argument was waiver. Our second on the merits of this was that when an I.I.U. investigation was underway, there was no A.R.P. process whatsoever. Our consistent argument was the State had failed to meet its burden in showing that that was in fact wrong. We made that argument to the court of appeals, which I think it endorsed. Roberts I'm not so much talking about waiver. I'm talking about evidentiary record. You may have made that argument, but you did not submit any of this material as a record. If it had been presented to the district court, they'd go through a normal process. Your Honor, you know, move for the admission of this as Exhibit A, you authenticate it, somebody comes in and says, and you'd have discovery on that. I mean, I don't know that there aren't 180 other cases out there that make the exact opposite point or make your point. And it just seems to me that if the case is going to go well, it seems to me to present a real serious problem of how we should consider the lodging. Well, first, Your Honor, I still think it does only support our burden argument and we still would think our burden argument is sufficient. But additionally, in the papers to this Court, Maryland has consistently said that the IIU and the AARP process were entirely distinct. At page 5 of their reply brief in support of certiorari, for example, they explained that our argument saying that the 2008 directive codified that existing practice, they said that that was plainly wrong. They said that in the district court and the court of appeals, right? Yes, Your Honor. But what we did in the lodging was we identified, in part, briefs that the Maryland Attorney General's office, the office responsible for litigating these cases in Maryland and in Federal court, briefs that they filed that were made materially different representations on these critical questions. That's at our lodgings. And is there any reason that couldn't have been done before the district court, before the court of appeals, and included in the record before this Court? Well, Your Honor, I think these materials, because they are briefs that the Court that the State of Maryland submitted in these cases, are things that are properly considered by this Court as legal documents. I think the Court frequently takes, considers briefs that parties have filed in other court filings. Well, these are not briefs. Your Honor, we do submit two briefs to the Court. So in our lodging, to pages 23 and 24, as well as lodging page 5, we are submitting briefs that they filed to the Maryland district court. Well, you are also submitting documents that were filed, I guess, by prisoners in particular cases? Your Honor, most of these documents were submitted by the State of Maryland as attachments to their briefs that they filed in Federal court. All of these documents that we have were the vast majority were submitted by Maryland as attachments to their briefs. A few were submitted by prisoners as attachments to a complaint, for example. But. Roberts But not part of the record in this case? They were not introduced in the court of appeals. That's right, Your Honor. But, again, it's consistent with our argument that the State has never worn its or met its burden of demonstrating that the ARP is in fact available in these circumstances. We still think they have never shown their burden to demonstrate it's available. But again. Alito Why should this issue of availability be decided by this Court as opposed to the district court or the court of appeals on remand? Your Honor, I certainly think that could be one possible outcome if the Court were to say that available as a legal matter means what we think it means, but that there could be subsidiary questions that would be left for remand. We would not quarrel with that outcome. Yes, Your Honor. We think that for a remedy to properly qualify as available within the meaning of the PLRA, the prison system must sufficiently inform an inmate as to which administrative remedy he or she needs to use to oppress a particular kind of claim, and then additionally needs to explain so a reasonable inmate would know the steps that he or she needs to take to have properly exhausted that remedy. What is the difference between that and what the statute used to say before it was amended, where it required exhaustion of such plain, speedy, and effective administrative remedies as are available? Yes, Your Honor, I think that's true. You're saying it has to be plain. No, Your Honor. I think there is a substantial amount of daylight between requiring an administrative remedy on one hand to be plain, on the other hand to have sufficient clarity that a reasonable prisoner would understand how it works. And perhaps an example, a prison remedy could — a prison system could create an administrative remedy that is, in fact, quite complex, that has several steps, perhaps some of the steps are conditional based on the kind of claim an individual is raising or based on the adjudication at the lower steps. That might be very complicated, but it would be perfectly fine so long as the prison accompanies that with sufficiently clear guidance that a reasonable inmate would know how to actually navigate the system. No — Kagan. Do you think that there is also substantial daylight between your standard and the Solicitor General standard? In other words, what I took the Solicitor General to be saying with respect to this clarity question is that the standard is if the procedures are so confusing that a reasonable person could not use them. That's his standard. Do you think that there's a difference between yours and his? Honestly, I don't think there's a substantial difference, Your Honor. I think we certainly agree with the Solicitor General that a reasonableness is necessarily incorporated into this. We disagree with the test that was articulated in their brief at page 21 where they suggest that the standard must be so high that if any conceivable reasonable inmate could fall — could satisfy the test, that that would be sufficient. We think that is certainly too high a test because if one of a hundred or one of a thousand inmates happens to get it right, that might not mean that it's a reasonable system. It just might mean if an inmate is reduced to guesswork, sometimes the inmate is going to guess correctly. Breyer, this is quite important to me, and the Solicitor General, I think, has made very clear why this is such an important question, not just your client, but I mean in general in the system. The Fourth Circuit copied a full page of what it said was the Second Circuit's special exceptions test, and then it listed it. And the rest of the opinion that you cite really is meant to be an application of that test. And what you were talking about is simply the procedural leg of that test. All right. So whatever words I or anyone else write here are going to take on a lot of importance in the prison system. So I'm nervous, as always, when that kind of thing happens. I'm not an expert in it. Now, there are several ways we could go. I mean, it sounds to me, even though I did write, and I think correctly, that there are exceptions, such as for constitutional issues, for example. Traditionally, there is no exception for the reasonable mistake. I'm not aware of any. And it sounds as if reasonable mistake is best put under the rubric of availability. Now, that's just tentative. But if I'm right in thinking that what we have here is simply an aspect of the availability question, then maybe the thing to do is send it back and argue out all the availability, including this in the court below, rather than us trying to write a standard. Or second, maybe we adopt the SG standard. Or maybe we adopt your standard. I don't know what rubric we'd put it under, under the rubric of exception, under the rubric of availability. Now, that's a general musing-type question, designed to provoke on your part a general response. Well, we certainly think that the outcome here was correct. So that's certainly our starting point. We think the best way to get there, the proper rubric that would apply in this case and all other cases, is an understanding of what available properly means. So I would suggest, I think, the statutory text and what available fairly has been held to mean by this Court in Booth and elsewhere does the work, certainly in this case and I think in the vast majority of cases. As the Court said in Booth, available here means accessible or capable of use. I don't think anyone would fairly describe a prison administrative remedy as one that's accessible or capable of use if a reasonable prisoner wouldn't know which remedy it is he or she is supposed to use in the circumstances or wouldn't know the proper steps that he or she needs to take in order to avoid procedural default under Woodford's standard. The system has to have that minimal degree of clarity for one to actually have been described as available. Certainly, Congress retained the word available after it amended the PLRA from the prior CRIPA, and available must have meaning. Congress certainly didn't say any standard or any remedy or all remedies. And again, I don't think Maryland even disagrees with us on this point because they say at the reply brief at page 5, they agree that if this administrative remedy, in their words, is indecipherable, that would not be one that qualifies as available. So I think there's broad agreement that the prison system can't take the rulebook, lock it in a box, not let any inmate understand how it works, and still call that system one that is fairly available. Kaganriadis If I could understand you, though, I mean, one argument that you would have, whether here or below or where, is this notion of the prison system didn't meet this level of clarity, whatever it is. But there's another argument, don't you think, or do you think, that you have, which is just they said to go to the ARP and the ARB, ARP was not in the business of giving this remedy, so we did exactly what we were told to do, and it turns out the remedy is unavailable because it's just not available? I think that's precisely correct. I absolutely agree with that view, that here in all of the cases that anyone has identified, and again, with both our lodging, but also in every case in Petitioner's lodging, and I would just point the courts to their lodging at page 25, 32, 37, 46, 93, 231, and there are others. Every example that anyone has identified, the ARP has always said, you've come to the wrong place, there can be no relief had here. I think that's plainly an unavailable system. As the Court in Booth said, for an administrative remedy to qualify as available, the administrative officers must have some authority to provide relief in the circumstances. Roberts, I don't mean to beat a dead horse, but the citations you cited, it is true that that's to the lodgings, but I don't have any confidence that these lodgings represent the complete universe to allow me to make a judgment about the procedures under Maryland law, because this wasn't litigated or subject to discovery in the district court or court of appeals. So, Your Honor, two things. First, again, we would not disagree if a remand could be appropriate for some of these issues. But second, I think there is enough that is undisputed in the record currently that doesn't even require a look in the whole to the lodgings to find that this was not an available system. To begin with, the IAU exclusivity regulation that we discuss at page 17 of the Red Cross brief made quite clear at the time of this incident that the IAU had exclusive authority whenever there was a referral that was made to the IAU at that point and that no other agency could proceed. That, again, has nothing to do with the lodging material, and I think makes quite clear that the ARP was not the proper place to go. We have the additional briefs, which I think are on somewhat different footing than some of the other agency materials. And we have the 2008 directive that did happen after the case, but made quite clear that the ARP is simply the not the correct place for these cases to go. So I think all of these things, even independent from the lodgings, demonstrate that there was an enormous amount of confusion as to how the system works and is not one that could be described in any sense as available without even looking too hard. Alito, I just want to say that even if the ARP procedure turns out to have been available as a formal matter, suppose that the issue were remanded and the district court explored it thoroughly and concluded that, although there's a lot of there are these materials that might suggest otherwise, as a formal matter, it is available even when the IAU procedure is going forward. All right. I don't know whether that would happen. Maybe it wouldn't. Assume that that's the case. You would still argue that the procedure was unavailable because, although it was available as a former matter, a formal matter, it is simply too confusing, right? And no reasonable inmate could take advantage of it. That's a separate argument. Yes, Your Honor. Yes. So, and that is why I think as to that argument, your client did not try to use any procedure. Isn't that correct? No, Your Honor. How is he confused? So on the day of the event, this is at the Joint Appendix, page 229 to 230, he filed a very detailed report of the incident. And he said at the bottom of page 229, this is three and four lines from the bottom, I'm asking for a formal internal investigation. The next page, after a signature, P.S., I will repeat this exact statement under oath at any time you need. Please investigate this incident. He filed this very clear report that described the entire incident, and he asked for the prison to respond. The prison did, in fact, respond the next day and instituted the I.I.U. investigation. So I think the question is, after he had taken this very clear affirmative step, would somebody in those circumstances, a reasonable prisoner, known that he had to do something else? And I think everything that we know shows that a reasonable prisoner wouldn't have understood he had to do anything else beyond the I.I.U. investigation. So, again, I think very clear affirmative steps he took. And the only question is, would he have known he had to go to the ARP process? He wouldn't have known because of the I.I.U. exclusivity regulation. He wouldn't have known because of the practice in Maryland prisons. And even if he had shown up there, we now understand that in all cases it was dismissed. There was a rubber stamp that was used to dismiss all of these claims. So for both of those reasons, he wouldn't have known to have gone there, and if he had gotten there, he would have shown up to a place that was going to dismiss him. Alitoso, but he received materials from the prison saying that the ARP procedure is available in cases of excessive use of force. Isn't that right? He did, Your Honor, but none of that material said anything whatsoever about the I.I.U. The I.I.U. exclusivity regulation, however, was specific, and generally the specific is going to, you know, govern over the general. And so on one hand, when you have a regulation that says the very specific I.U. mechanism is exclusive, all other agencies are. Alitoso, what did he see that said that the I.I.U. procedure was specific? Well, it was in the. I'm sorry, it was exclusive. It was in the regulations that, again, all of the regulations that Maryland had enacted that would be available to prisoners. And he read those. No, Your Honor. I don't think there's direct evidence that he read those, but I think the question is what an objectively reasonable prisoner would have understood. And the only guidance that was specific to the I.I.U. that had anything to do that would inform a prisoner, once you're in the I.I.U. channel, what is it that you should be doing at that point, said this was the exclusive mechanism, all other agencies have to relinquish authority. So I think that very tailored guidance would certainly trump the broad policy statements that exist in the other regulations in the Maryland Handbook that say nothing whatsoever as to an inmate as to what he should do when the I.I.U. investigates. And I should also add that one of the interesting things about this case is the I.I.U. investigations are the investigations where the Maryland prison itself, it initiates them because it thinks those are the most serious incidents in the prison. That's where Maryland thinks that its own prison officials may have engaged in criminal wrongdoing, and therefore they need to undertake this process. What Maryland has done is created very substantial trips and traps for only the cases that are most likely to correspond to the very worst conduct in Maryland prisons. So I think that's a particularly pernicious aspect of creating the system where you're confused, you're told to go to the AARP, but then the AARP in all cases is going to dismiss your claim, telling you that you've come to absolutely the wrong place. And again, I think all of the material at this point is totally consistent on the view that this is how the AARP would have worked. It was codified by the 2008 directive that we discussed at the red brief at page 18, and I think there's little question at this point that there was a codification of existing practice that happened in 2008, because all the examples anyone has identified is consistent with the view that the 2008 directive served to codify what was in the record. Sotomayor, where is the recent amendment? It's at page 367 of the joint appendix. And this is part of the directives. It's a long directive that provides several different pieces of guidance as to how the AARP procedure works. And at towards the bottom of joint appendix, page 367, it explains, quote, the warden or institutional coordinator shall issue a final dismissal of a request for procedural reasons when it has been determined that the basis of the complaint is the same basis of an investigation of the authority of the IIU, provides some additional details, and it says it provides the text that now appears on the rubber stamp, which is your request is dismissed for procedural reasons, final, the issue is being investigated by IIU, case number blank. Since this case shall be investigated by IIU, no further action shall be taken within the AARP process. So this is, I think, a quite clear regulation as to how the system now works. I'll note that Maryland's view at footnote 9 of their reply brief is that even today, notwithstanding this new directive, their view is the way the system works is a prisoner still has to go to the AARP to properly exhaust their claims in these circumstances, despite the fact that this regulation, I think, is crystal clear that if you do so, your claim is going to be denied. And you're not told, contrary to the suggestion that you would know to appeal, you're not told that you should appeal this dismissal anywhere. There's not a shred of guidance that says when you have your AARP dismissed because you've been told you've come to the wrong place, the proper thing is just to keep appealing it. You're told that it's being dismissed because of the IIU investigation. So I think a reasonable prisoner would be quite clearly led to believe that the IIU is, in fact, the only thing that needs to happen in his particular case and would clearly be misled into not actually appealing. So I think it's much more likely that it's the unreasonable prisoners who disregard the clear guidance that they're getting who continue to appeal in these circumstances. Now, one additional point, the Maryland referenced the McCulloch case saying that there's State authority that indicates that the Inmate Grievance Office is the exclusive avenue for these sorts of cases and rested on the McCulloch case here. I think that argument is misplaced. The McCulloch case that they cite was decided in 1989. The internal investigative unit that's at issue here was not established until 1999, a full decade later. So I think the use in the reply brief of the McCulloch case to say that the IGO is this broad-based mechanism is not responsive in any event to what happens now with the IIU investigation, because the IIU simply didn't exist at the time that the McCulloch case was decided. So I think that our view is quite clear that if Maryland's system in this case were endorsed, that would become a very clear model for what other prisons could enact, this sort of upside-down system where you're told you have to go to the AARP process to properly exhaust. But once you get there, you're told that you've absolutely come to the wrong place, and despite any guidance, you have to somehow know that you need to appeal contrary to the instructions that you're being given in order to properly exhaust your claim. As the Court said in Woodford, to properly exhaust and to avoid procedural default, the prisoner needs to use the steps that the prison properly holds out. Here, the State is doing the very opposite of holding out these steps as available to the prisoners. The State is saying you've come to the wrong place, you're using the wrong steps. That can't be what I think the Court meant for proper exhaustion as is required by Woodford. I'd be pleased to take any more questions the Court might have. Roberts.